UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THURSTON BRENT McAFEE, | No. C-09-2497 EMC (pr) |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| BEN CURRY, *et al.*, | **(Docket No. 39)** |
| Defendants. _____/ | |

## I. INTRODUCTION

During the course of the day on May 30, 2008, riots erupted at three different locations at the Correctional Training Facility ("CTF") in Soledad, California. Plaintiff, Thurston McAfee, was injured during the third riot. He was disciplined for being a participant in the riot, although that disciplinary decision was later overturned. In this *pro se* prisoner's civil rights action, he has sued correctional officers for violating his Eighth Amendment rights by being deliberately indifferent to a risk to his safety and for violating his right to due process during the disciplinary proceedings against him. Defendants now move for summary judgment and plaintiff opposes the motion. For the reasons discussed below, the Court **GRANTS** Defendants' motion. The Court will enter judgment in favor of some Defendants and dismiss other Defendants.

## II. BACKGROUND

The following facts are undisputed unless otherwise noted:

Plaintiff McAfee was an inmate at CTF during the relevant time period from May 2008 through July 2008. On May 30, 2008, he was working in the culinary department as a clerk.

Defendant B. Hill was a correctional officer ("C/O") at CTF. On May 30, 2008, he worked the kitchen post, where he had worked for the past three years. As the kitchen officer, his duties and responsibilities included supervising inmates, inspecting their work, maintaining proper sanitation standards, and maintaining custody of kitchen equipment.

Defendant Rivero was a correctional lieutenant at CTF. He was the senior hearing officer who presided over McAfee's July 1, 2008 disciplinary hearing on the charge of participating in a prison riot on May 30, 2008.

Three other Defendants – Days, Ingraham and Verdesoto – were voluntarily dismissed without prejudice from this action. Correctional sergeant Days worked as the kitchen sergeant, C/O Ingraham worked in the kitchen at CTF, and correctional sergeant Verdesoto worked in the Rainier Hall housing unit on May 30, 2008.

A.   The Kitchen And Dining Halls[1]

In the afternoon, the kitchen and dining halls typically were staffed by one kitchen officer, one A-Yard dining hall officer, one B-Yard dining hall officer, one kitchen sergeant, two staff cooks and about 45-50 inmates. The inmates who worked in the kitchen and dining halls (hereinafter referred to as the "culinary inmates") are of different races and come from housing units on A-Yard and B-Yard. The culinary inmates work as a team on a daily basis to do numerous chores, such as preparing, cooking and serving meals; cleaning the kitchen and surrounding areas; preparing the dining halls for meal services; ordering supplies; unloading food from trucks; and preparing for the next day's meals.

For inmates, working is a component of programming in the prison. This means generally that an inmate who is employed at the prison has expressed a commitment to non-violence, rehabilitation, acquiring vocational skills, and maintaining good work ethics.

From about 5:00 a.m. until about 3:05 p.m. on May 30, numerous inmates worked in the kitchen and the dining halls. Things were normal in the opinion of the kitchen officer, C/O Hill. As

---

[1] Defendants included with the declaration of Defendant Hill (Docket # 42) and the notice of correction to ¶ 17 of the Hill declaration (Docket # 46) a labeled photograph of the prison facility and diagrams of the dining areas that are very helpful to understanding the parties' description of events.

of 3:05, the kitchen and dining halls were staffed by one staff cook, sergeant Days, and C/Os Hill, Woods and Hernandez.

B.  Code 3 Alarm For Lassen Hall

During a disturbance at the prison, the responding officer will call a code over the radio, ranging from Code 1 through Code 3, with Code 1 calling for the lowest response and Code 3 calling for the highest response by staff. "For safety and security reasons, a code alarm contains only the code level and the disturbance's location because the details of the emergency (for example, a riot between two particular gangs or races) may prompt inmates in the unaffected areas to create a disturbance." Hill Decl., ¶ 13.

At about 3:05, C/O Hill heard a Code 1 alarm and, shortly thereafter, a Code 3 alarm for Lassen Hall, a housing unit on the A-Yard. The disturbance in Lassen Hall involved Black and Hispanic inmates, although there is no evidence that Hill knew that information at the time.

After the Code 3 alarm for Lassen Hall, sergeant Days told C/O Hill and another officer to move all the culinary inmates to the B-Yard dining halls. This move prevented the inmates from being able to look out the windows to observe the disturbance in Lassen Hall and staff's response to it. Sergeant Days told C/O Woods to report to the patio immediately after securing the inmates in the B-Yard dining halls. Sergeant Days and C/O Hernandez then left the kitchen for Lassen Hall.

The parties disagree as to whether McAfee requested to be locked into the clerk's office in the kitchen. C/O Hill declares that McAfee did not so request, and McAfee declares that he did. According to McAfee, after sergeant Days directed that the inmates be moved into the B-Yard dining halls, McAfee "called C/O Hill and requested to be allowed to remain at his work station because he had surgery (2) two days prior and could not walk without the use of crutches. C/O Hill refused [McAfee's] request, stating, 'all inmates must be secured!' [McAfee] asked to be locked in his work area. C/O Hill refused [McAfee's] request, stating 'Sgt. Days wants all inmates in the B-side chow halls.'" Complaint, ¶ 13; *see also* McAfee Decl. #1, ¶ 6.[2] The Court accepts non-movant

---

[2] McAfee submitted two separate declarations as one document. Docket # 49 contains both the "Declaration Of Plaintiff Thurston B. McAfee, in Opposition To Defendant Officer B. Hill's Motion For Summary Judgment" as well as the "Declaration of Plaintiff Thgurston (sic) B McAfee In Opposition To Defendant J. Rivero's Motion For Summary Judgment"). The declarations are

McAfee's version as true and assumes for purposes of this motion that Hill refused McAfee's request to be locked in the clerk's office.

C/O Hill declares that, during a Code 3 alarm, all the inmates had to be in one designated location and he was not permitted to lock any inmate in the clerk's office because he would lose sight of the inmate with the door shut. "Particularly during a prison disturbance and in accordance with protocol, [Hill] must be able to monitor and access the inmate." Hill Decl., ¶ 23. McAfee, on the other hand, states that he had "often been locked in the office by defendant Hill when doing important work," McAfee Decl. #1, ¶ 12, although he does not state that any of those occasions were during a time when Code 3 alarms were being sounded.

C/Os Hill and Woods moved all the culinary inmates to the B-Yard dining halls without incident. Inmates who lived on the B-Yard were placed in the B-4 dining hall and inmates (including McAfee) who lived on the A-Yard were placed in the B-3 dining hall. C/O Woods then left the kitchen.

C/O Hill and a staff cook watched the inmates in the B-Yard dining halls. Some inmates played cards, some chatted with each other, some took bathroom breaks, and some cleaned the kitchen. Many appeared curious about the nature of the emergency. Some time after the Lassen Hall alarm, C/O Hill allowed several inmates to go into the kitchen to clean the pots and pans, and prepare the attendance record. C/O Hill believed that the inmates he released for these chores were the most dependable workers who would get the chores done without incident. C/O Hill paced between the B-Yard dining halls and kitchen to watch the inmates. C/O Hill did not detect any serious tension or problems among the inmates.

C. Code 3 Alarm For Fremont Dorm

At about 4:15 p.m., C/O Hill heard a Code 1 alarm and, shortly thereafter, a Code 3 alarm for the Fremont Dorm, another housing unit on the A-Yard. This disturbance also involved Black and Hispanic inmates and "was quickly brought under control." Complaint, ¶ 11. C/O Hill immediately recalled the inmates who were in the kitchen back to the B-Yard dining halls.

---

referred to as McAfee Decl. #1 and McAfee Decl. #2 for the sake of clarity.

1   For the next 2-3 hours, C/O Hill and the staff cook observed the inmates for any serious
2   tensions or problems, but did not detect any.  As with the earlier alarm for Lassen Hall, C/O Hill had
3   no information about the disturbance other than that it was a Code 3 alarm for the Fremont Dorm.
4   C/O Hill instructed the same inmates whom he had released earlier to the kitchen to go back
5   to the kitchen to finish their chores and allowed other inmates to use the restrooms.  C/O Hill paced
6   between the dining halls and kitchen to watch the inmates.
7   During this time, McAfee again asked to be locked in the clerk's office, and C/O Hill again
8   refused his request.  McAfee Decl. #1, ¶ 8.
9   Although C/O Hill observed no tensions, McAfee states that after the second alarm sounded
10  at about 4:15, the "Southern Hispanic inmates began grouping into a huddle.  They stayed in a
11  huddle for approximately 10 minutes."  Complaint, ¶ 14; *but see* McAfee Decl. #1, ¶¶ 6-7 (huddling
12  occurred before second alarm at 4:15).  McAfee states that Hill "failed to see that the Southern
13  Hispanic inmates had huddled up initially and that Black and Hispanic inmates were not even
14  talking."  McAfee Decl. #1, ¶ 15.  The Southern Hispanic inmates began requesting bathroom breaks
15  and Hill began letting inmates out to use the bathroom at about 4:45.  Complaint, ¶ 14.  The inmates
16  who had been allowed into the kitchen to clean up were returned to the dining halls and locked back
17  into the dining halls at about 6:45, at which time they had pots and pans with food in them, as well
18  as ladles and milk crates.  *Id.* at ¶ 15; *see also* McAfee Decl. #1, ¶ 9.  The inmates later passed trays
19  and more pans and spoons through the serving window.  McAfee Decl. #1, ¶ 11.

20  D.   Trouble In Dining Halls

21  Almost three hours after the Fremont Dorm alarm, C/O Hill observed the inmates in the B-
22  Yard dining halls segregating themselves by race, although he did not detect any serious tension
23  among them.  Hill then recalled the inmates who were in the kitchen back to the dining halls and
24  immediately called sergeant Popplewell to inform him that the inmates had racially segregated
25  themselves.  Sergeant Popplewell responded that he would send some officers to the dining halls
26  soon.  C/O Hill and the staff cook continued to monitor the inmates in the B-Yard dining halls.
27  About 5-10 minutes after the call, sergeant Popplewell and several security squad officers
28  arrived at the kitchen and B-Yard dining halls.  C/O Hill repeated to Popplewell that the inmates

were dividing by race. During this time, an inmate came out of the kitchen bathroom and Hill was instructed by one of the squad officers to secure that inmate in the A-Yard dining hall. Hill complied with this instruction and left. Hill was relieved of his duty to supervise the inmates in the B-Yard dining halls.

While in the A-Yard dining halls, C/O Hill heard a Code 1 alarm that was quickly elevated to a Code 3 for the B-Yard dining halls. C/O Hill continued monitoring the inmate and cleared the A-Yard dining hall doors of any obstruction so that the emergency responders from the prison yard could easily pass through the dining halls to the kitchen to the B-Yard dining halls. Hill did not witness the B-Yard dining hall riots.

The dining hall riot started after the security squad officers attempted to move the Black inmates, including McAfee, to another location. When the guards ordered the Black inmates to move toward a corner of the dining hall, McAfee "began to stand and reach for [his] crutches" and was attacked by several Southern Hispanic inmates. McAfee Decl. #1, ¶ 11. The Southern Hispanic inmates punched and kicked him, may have hit him with ladles, and knocked him into unconsciousness. *See* Declaration of Counsel, Ex. 1 (hereinafter "McAfee Depo.") RT 98; Complaint, ¶ 16. He fought back and punched at his attackers. McAfee Depo., RT 98 ("I fought back as best I could."), *id.* ("I was throwing punches.").

McAfee was taken to the infirmary shortly after 8:00 p.m. A "medical report of injury or unusual occurrence" was prepared. Complaint, Ex. B. On the report, the medical staff noted, among other things, that he had a laceration on the top of his head and pepper spray exposure in the facial, neck, upper chest and upper back areas. Other than that one-page medical report, no party submitted any medical records for McAfee.

According to the incident report, responding correctional staff observed "numerous black and Hispanic inmates fighting each other. The inmates were using milk crates and metal serving pans as weapons." Complaint, Ex. A at 4. Correctional staff used batons and pepper spray on the rioting inmates, who eventually assumed prone positions on the floor. *Id.* Medical staff was then directed to an injured inmate. *Id.*

6

While the inmates in the dining hall were fighting, "a radio transmission was made from Toro Dorm requesting assistance as there appeared to be mounting tension. Officers responded to Toro Dorm" where the inmates complied with orders to get to their bunks and later for all Black inmates to be removed to another area. *Id.* In other words, the fourth potential riot for the day was avoided and tensions resolved without violence.

E.     The Disciplinary Charge

A serious rules violation report – also known as a CDC-115 for the number of the form used – was issued to McAfee on June 12, 2008 charging him with participating in a riot.[3] The description of the circumstances of the offense noted that there were three riots on May 30. As a result of the initial riot in Lassen Hall, "two more riots ensued, Fremont Dorm and in the dining hall on A & B side. The riots involved Black and Hispanic inmates at CTF-North Facility. . . . Inmate McAfee, B-95737, LA-115U, you were identified as being out in **Lassen Hall** during the riot in which you were a participant. Furthermore, according to the CDC-7219, Medical Report of Injury, it was noted that you received the following injuries: laceration to top of head; abrasion/scratch to chin, O.C. spray exposure that were consistent to being an active participant in a riot." Rivero Decl., Ex. 1 at AGO-004 to AGO-005. A copy of the CDC-115 and supporting documentation was served on McAfee on June 10, 2008.

McAfee requested and received an investigative employee in connection with the disciplinary proceedings. The investigative employee interviewed McAfee and C/O Hill about the riot and later prepared an investigation report which was given to McAfee on June 24. The investigative employee reported that (1) McAfee had stated that he had been attacked by an inmate in the dining hall where he was located at the time of the riot and (2) C/O Hill had stated that

---

[3] The CDC-115 listed § 3005(c) as the section of Title 15 of the California Code of Regulations as the section violated. This apparently was a mistaken reference to an outdated version of the regulation concerning inmate conduct. On May 30, 2008, § 3005(c) prohibited inmates from refusing to accept a housing assignment and § 3005(d) prohibited the use of force or violence on another. Section 3005's subsections had been re-lettered effective December 28, 2007; prior to the December 28, 2007 re-lettering subsection (c) had been the section that prohibited the use of force or violence on another.

McAfee was in the dining hall but Hill did not know if he was involved in the riot. *See* Rivero Decl. Ex. 1 at AGO-001 to AGO-002.

The rule violation hearing was held on July 1, 2008, at which lieutenant Rivero was the presiding hearing officer. McAfee pleaded not guilty and denied being in Lassen Hall during the riots. Lieutenant Rivero believed that McAfee's injuries and pepper spray exposure were significant because officers were trained to (a) spray pepper spray at a non-complying inmate's face during a disturbance and (b) instruct inmates to get down on the ground immediately and prone out (meaning face down and hands at sides). Rivero believed that McAfee – who had injuries to his head and had pepper spray exposure on his face and upper chest, among other areas – likely ignored orders to get down on the ground immediately and prone out after the start of the riot. In response to a question from Rivero, McAfee explained how he received his injuries: "'I was standing up to grab my crutches and when I turned around they got me.'" *Id.* at AGO-006. Rivero then asked how McAfee got pepper sprayed, to which McAfee responded, "I don't know." *Id.*

McAfee requested that C/O Hill testify at the rule violation hearing. Lieutenant Rivero denied this request because C/O Hill lacked personal knowledge, *i.e.*, C/O Hill did not know whether McAfee participated in the dining hall riot, but only could confirm that McAfee was in the dining hall when the riot started. *Id. see* Rivero Decl., ¶ 19.

Lieutenant Rivero found McAfee guilty of participating in a prison riot. Lieutenant Rivero made a finding that McAfee "wasn't in Lassen Hall at the time of the riot, but was in the dining hall when the riot occurred as Officer B. Hill stated that he seen (sic) Inmate McAfee in the dining hall when the riot occurred in the dining hall." Rivero Decl., Ex. 1 at AGO-006. Rivero also made a finding that McAfee "sustained laceration to the top of his head and O.C. Pepper Spray exposures are a result of participating in the riot." *Id.*

As a result of the finding of guilt on the CDC-115, McAfee was disciplined. He was assessed a forfeiture of 90 days of time credits and was put on Privilege Group "C" status for 90 days. *Id.* at AGO-004. In Group "C" status, his privileges consisted of only: (1) $45 of canteen draw per month, (2) access to the yard for an hour on Mondays, Wednesdays and Fridays, and (3) emergency telephone calls only. *See id.*; Rivero Decl., ¶ 21. McAfee also was referred to the

prison's classification committee for assessment of a security housing unit ("SHU") term for participating in a riot.

The prison classification committee assessed a 90-day SHU term for the disciplinary offense. From May 30, 2008 until mid July 2008, McAfee remained in his regular cell on lockdown and was not put in segregated housing because there was not room for him in the SHU. McAfee Depo., RT 159-61. McAfee states that he spent a total of 204 days in the SHU, but does not dispute that the additional days beyond the 90-day SHU term were unrelated to the disciplinary charge and were instead related to his gang status. He does not allege that any defendant had any role in the gang determinations.

McAfee appealed the disciplinary decision. His inmate appeal was granted at the director's level, which is the highest level of administrative review. The director's level decision found that McAfee was not in Lassen Hall and was instead in the dining hall during the later disturbance involving Black and Southern Hispanic inmates.

> A review of the [CDC-115] and subsequent CDCR 837 does not provide information that would establish that a preponderance of evidence was presented to support the finding of guilt. The CDCR 7219 indicates that the appellant received a laceration on his head, but there are no other injuries noted that would be consistent with being involved in a fight. For example, there were no marks on his hands, such as a reddening of the knuckles or any staff member observing the appellant fighting with another inmate. The appellant's explanation of how he sustained the laceration is plausible when there is no other evidence to indicate that the laceration was the result of being involved in a fight. The appellant's exposure to OC spray does not establish a preponderance of guilt because the CDCR 837 indicates that staff utilized OC spray to quell the disturbance. The appellant's exposure was more likely than not the result of random burst of OC spray from more than one correctional staff member.

Complaint, Ex. H at 1-2. The director's level decision overturned the disciplinary decision and restored all assessed penalties, including the sentencing credits.

### III.   VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims occurred at a prison in Monterey County, within the Northern District. This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted.) The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

On issues as to which the moving party bears the burden of proof at trial – such as the qualified immunity defense in this case – he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. Smith*, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. *Id.* at 1537. Once the moving party has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). The complaint was signed under penalty of perjury and therefore may be considered in deciding the motion for summary judgment.

## V. DISCUSSION

### A. Claim Against C/O Hill

The Eighth Amendment's prohibition of "cruel and unusual punishments" imposes a duty on prison officials to, among other things, "'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). That duty includes protecting inmates from violence at the hands of other inmates. *See id.* at 833; *Hoptowit v. Ray*, 682 F.2d 1237, 1250 (9th Cir. 1982). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation is, objectively, sufficiently serious; and (2) the prison official is, subjectively, deliberately indifferent to inmate safety. *See Farmer*, 511 U.S. at 834. In the Eighth Amendment context, the test for deliberate indifference is the same as criminal recklessness, *i.e.*, the official must actually know of and disregard an excessive risk to inmate safety. *See id.* at 837. The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Neither negligence nor gross negligence constitutes deliberate indifference. *See id.* at 835-36 & n.4; *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A prison official need not "believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault" although he must have more than a "mere suspicion" that an attack will occur. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) (citations and internal quotations omitted); *see also Farmer*, 511 U.S. at 842.

When there is actual unrest and conflict occurring at the prison, the deliberate indifference standard does not adequately take into account the competing institutional concerns for the safety of

11

prison staff or other inmates. *Whitley v. Albers*, 475 U.S. 312, 320 (1986). Where the prison security measure is undertaken to resolve a disturbance that poses significant risks to the safety of inmates and staff, "the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.* at 320-21 (citation omitted). In *Johnson v. Lewis*, 217 F.3d 726 (9th Cir. 2000), the Ninth Circuit considered the applicable standard to inmates' claims about their treatment during a riot as well as after they were secured in the prison yard (handcuffed, laying on the ground and under armed guard). "[T]he exigent circumstances the prison officials faced during the riots persisted until the officials were able successfully to remove the prisoners from the buildings and secure them in the prison yard. The prison officials' actions and accompanying state of mind should therefore be measured against the *Whitley* standard for an Eighth Amendment violation until that point." *Id.* at 734. For events after the inmates were secured in the yard and presented no further danger, the deliberate indifference standard applied to the prison officials' actions. *Id.*

      Here, the actions in question were taken in response to actual unrest occurring at the prison, but that unrest was not occurring in the dining hall at the time of C/O Hill's refusal to lock McAfee in the office. It thus appears that, as in *Johnson*, both the deliberate indifference and the *Whitley* standards apply to separate portions of the events. The deliberate indifference standard applies to the events up until the inmates in the dining halls segregated themselves by race, and the *Whitley* standard applies thereafter because that is the point at which the unrest and conflict started in the dining halls.

      On the undisputed evidence no reasonable jury could find in McAfee's favor on his Eighth Amendment claim against defendant Hill. One cannot reasonably infer from the mere fact that McAfee was attacked that C/O Hill acted with deliberate indifference beforehand. When one looks for evidence beyond the mere fact of the attack in the dining halls to show that C/O Hill acted with deliberate indifference, the search turns up empty.

      It is undisputed that the culinary inmates were gathered into B-Yard dining halls in response to the disturbances elsewhere in the prison. During C/O Hill's supervision of the inmates in the

1  dining halls for about 3-4 hours (until the inmates segregated by race), there was no apparent threat
2  to McAfee's or any other culinary inmate's safety, no violence in the dining halls, and no indication
3  that the Hispanic inmates would attack McAfee or other Black inmates.  It is undisputed that the 40-
4  50 culinary inmates Hill supervised were inmates from different housing units and of mixed races
5  who got along and worked together to perform kitchen-related duties before May 30.  It also is
6  undisputed that they assembled peacefully when they were gathered in the dining halls upon the
7  Code 3 alarms for Lassen Hall and Fremont Dorm.  It is undisputed that C/O Hill saw no tension
8  among the inmates until he noticed them segregating by race, at which time he promptly called for
9  assistance.  It is undisputed that a correctional sergeant arrived with security squad officers in 5-10
10 minutes, that Hill followed the correctional sergeant's orders to escort another inmate to the A-yard
11 dining hall, and that Hill was not present when the Hispanics attacked the Black inmates in B-Yard
12 dining halls.
13     McAfee twice asked C/O Hill to lock him in the clerk's office because he was on crutches.
14 C/O Hill's alleged refusal to grant the request does not support an inference of deliberate
15 indifference to McAfee's safety in light of the undisputed evidence described in the preceding
16 paragraph about the culinary inmates.  Further, although McAfee had been locked in the clerk's
17 office in the past, there is no evidence that he was ever locked in there during a Code 3 alarm at the
18 prison and there is no evidence that Hill could simultaneously see him in the office and the rest of
19 the culinary inmates who had been moved into the dining halls.  The photo of the office shows a
20 window about 15" square in the door that would allow one to see what was going on in the room if
21 one were quite close to the door.  *See* Docket # 48 at p. 20 of 108.  Visualizing an inmate in that
22 office would divert the officer's attention from the dozens of inmates in the B-Yard dining halls
23 because the clerk's office was located at the far end of the kitchen away from the B-Yard dining
24 halls.  *See* Notice of Correction To ¶ 17 of Hill Declaration (docket # 46).  Also, the evidence
25 plainly shows that the refusal was part of the security measures taken in response to the
26 disturbances:  a sergeant had ordered Hill to put the all the culinary inmates in the B-Yard dining
27 hall after the Code 3 alarm was sounded for an A-Yard housing facility.  *See* McAfee Decl. #1, ¶ 6.
28 Conceivably, it would have been reasonable for C/O Hill to determine that the inmate should be

locked in the office because he was on crutches, but "such an oversight simply does not rise to the level of an Eighth Amendment violation. Officials cannot realistically be expected to consider every contingency or minimize every risk" when violence erupts at a prison. *Whitley*, 475 U.S. at 325. Hill's failure to make special provision for McAfee did not amount to deliberate indifference under the circumstances where that provision would have hampered his ability to monitor all the culinary inmates.

McAfee urges that defendants "knew Southern Hispanic inmates were under perpetual orders to attack as a group and spontaneous from their in-service training," Complaint, ¶ 29, but offers no competent evidence to support that assertion. He also argues that it was obvious that a riot would eventually erupt in the dining halls, but the evidence does not support his argument. In fact, the evidence in the record supports the opposite inference, at least with regard to culinary inmates who had worked together and had demonstrated their commitment to non-violence and other rehabilitative goals.

McAfee repeatedly urges that C/O Hill knew there was a riot between races or gangs in progress in Lassen Hall and Fremont Dorm. The evidence does not support his argument. C/O Hill explained that, "[f]or safety and security reasons, a code alarm contains only the code level and the disturbance's location because the details of the emergency (for example, a riot between two particular gangs or races) may prompt inmates in the unaffected areas to create a disturbance." Hill Decl., ¶ 13. The evidence shows only that Hill was aware of a serious disturbance based on the Code 3 alarm being sounded. There is no competent evidence that all disturbances in prison are race-based or gang-related, or that Hill knew that this was a race-based disturbance.

McAfee's evidence that C/O Hill allowed some inmates who entered the kitchen late in the day to bring food service items (*e.g.*, pots and pans with food in them, and serving utensils) to the dining halls in violation of an unidentified rule or regulation shows at most negligence by Hill, but negligence is not deliberate indifference. These were kitchen and dining room workers, and at the time there was no tension among them evident to Hill. Moreover, McAfee agrees that Hill did not see the Hispanic inmates huddling together earlier when the alarm was sounded for the Fremont Dorm disturbance.

Viewing the evidence and inferences in the light most favorable to McAfee, he has not raised a triable issue of fact in support of his claims that Hill's refusal to lock him in the office was done in deliberate indifference to a risk to his safety. McAfee has not raised a triable issue of fact that Hill knew of facts from which the inference could be drawn that a substantial risk to McAfee's safety existed and disregarded it when he refused to lock McAfee in the office and instead made him gather with the other culinary inmates he was supervising.

With regard the response of C/O Hill when he noticed the culinary inmates segregating by race, no reasonable jury could find that Hill acted maliciously and sadistically for the very purpose of causing harm when he promptly called for assistance. There is no evidence to support such a finding. Defendant Hill is entitled to summary judgment in his favor on the Eighth Amendment claim.

Defendant Hill also is entitled to qualified immunity against the Eighth Amendment claim. The defense of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an official is entitled to qualified immunity, the court must decide whether the facts alleged show the official's conduct violated a constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier v. Katz*, 533 U.S. 194, 20102 (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier*'s requirement that qualified immunity analysis proceed in a particular sequence). "[I]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. The Court has concluded that the evidence fails to show a violation of McAfee's Eighth Amendment rights. Therefore, Hill prevails on the first prong of the *Saucier* test. Furthermore, the undisputed facts establish that no reasonable officer in Hill's position would have known his conduct was unlawful. As a matter of law, defendant Hill is entitled to qualified immunity against the Eighth Amendment claim.

B.     Due Process Claim

The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution protects individuals against governmental deprivations of life, liberty or property without due process of law. Changes in conditions of confinement for a prison inmate may amount to a deprivation of a constitutionally protected liberty interest, provided that the liberty interest in question is one of "real substance." *Sandin v. Conner*, 515 U.S. 472, 477-87 (1995). An interest of "real substance" will generally be limited to freedom from (1) restraint that imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *id.* at 484, or (2) state action that "will inevitably affect the duration of [a] sentence," *id.* at 487. In determining whether a restraint is an "atypical and significant hardship," courts consider whether the challenged condition mirrored the conditions imposed on inmates in administrative segregation and protective custody, the duration of the condition, the degree of restraint imposed, and whether the discipline will invariably affect the duration of the prisoner's sentence. *See Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003); *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003).

The process due in a prison disciplinary proceeding that results in the deprivation of a protected liberty interest includes written notice, time to prepare for the hearing, a written statement of decision, allowance of witnesses and documentary evidence when not unduly hazardous, and aid to the accused where the inmate is illiterate or the issues are complex. *Wolff v. McDonnell*, 418 U.S. 539, 564-67 (1974). The Due Process Clause only requires that prisoners be afforded those procedures mandated by *Wolff* and its progeny; it does not require that a prison comply with its own, more generous procedures. *See Walker v. Sumner*, 14 F.3d 1415, 1419-20 (9th Cir. 1994). The findings of the prison disciplinary decision-maker must be supported by "some evidence" in the record to comport with due process. *See Superintendent v. Hill*, 472 U.S. 445, 454 (1985) (some evidence must support decision that results in revocation of good time credits). There also must be some indicia of reliability of the information that forms the basis for prison disciplinary actions. *Cato v. Rushen*, 824 F.2d 703, 704-05 (9th Cir. 1987).

In his complaint, McAfee asserted that his right to due process was violated when sergeant Rivero (1) found him guilty without sufficient evidence, (2) denied a requested witness for the

1  disciplinary hearing, and (3) failed to read the reports. Defendant Rivero urges that he is entitled to
2  summary judgment on McAfee's due process claim because McAfee received all the procedural
3  protections to which he was entitled assuming that he had a protected liberty interest.[4] The Court
4  agrees.

5   First, no reasonable jury could find that there was not some evidence to support the
6  disciplinary finding that McAfee had participated in a riot. The evidence was undisputed that
7  McAfee had sustained an injury to the top of his head and had pepper spray exposure on, among
8  other things, his face and upper chest. In light of Rivero's knowledge that officers are trained to
9  instruct inmates to get down on the ground immediately and to spray the face of a non-complying
10  inmate, the location of the pepper spray exposure on McAfee was significant. It suggested that
11  McAfee had not promptly complied with orders to get down and instead remained upright long
12  enough to get squirted with pepper-spray in the face and upper chest. McAfee presented his defense
13  that he was in the dining hall rather than in Lassen Hall, and was attacked when he stood up to get
14  his crutches. *See* McAfee Decl. #2, ¶ 7. It is undisputed that, when asked how he got pepper-
15  sprayed, McAfee responded that he didn't know how that happened.

16   The CDC-115 charged McAfee with participating in a riot and listed the location as Lassen
17  Hall, even noting that he had been identified as a participant in that riot. McAfee apparently thought
18  it was enough to show that he wasn't in Lassen Hall. However, the gravamen of the offense was
19  participating in a riot rather than being in Lassen Hall. C/O Rivero has no liability for the error in
20  the original charge in the CDC-115, when his determination was that McAfee participated in a riot
21  in the dining halls. Rioting is not permitted anywhere in the prison, so McAfee's ability to show
22  that he was not present at one of the three places at which riots occurred does not show that there
23  was not some evidence that he was at one of the other two places at which the riots took place that
24  day.

---

[4] Defendants also argue that McAfee was not deprived of a protected liberty interest because he was not subjected to an atypical and significant hardship as a result of the disciplinary decision. The Court need not reach this difficult issue in light of the conclusion that McAfee received all the procedural protections that he was entitled to, assuming that the discipline imposed amounted to an atypical and significant hardship in relation to the ordinary incidents of prison life.

17

The disciplinary decision later was overturned in the inmate appeal process. The determination by the inmate appeal reviewer that there was not a preponderance of the evidence to support the disciplinary decision does not prove or support an inference that there was not some evidence to support the disciplinary decision. The "some evidence" standard required by due process is lower than the preponderance of the evidence standard, and requires only that there be "some evidence" from which the conclusion of the decision-maker could be deduced. *See Superintendent v. Hill*, 472 U.S. at 455. An examination of the entire record is not required nor is an independent assessment of the credibility of witnesses or weighing of the evidence. *Id.* The relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary decision-maker. *Id*. With *Superintendent v. Hill* providing the governing standard for the due process claim, it is not enough for McAfee to simply show a dispute about his guilt; instead, he had to – but did not – show that a reasonable jury could conclude there was not some evidence to support the disciplinary decision. Finally, the Court notes that even though he did not make the statement at the rule violation hearing, McAfee's admission in his deposition that he threw some punches at his attackers undermines his assertion that he did not participate in the riot that day.

Second, on the evidence in the record, no reasonable jury could conclude that Rivero found McAfee guilty without reading the reports in the record. McAfee alleged in his complaint that Rivero violated his right to due process by not reading reports, such as the medical report and the incident report, but has offered absolutely no competent evidence to support this allegation. Accordingly, no reasonable jury could find in his favor on this claimed due process violation.

Third, on the evidence in the record, no reasonable jury could conclude that Rivero denied McAfee his right to due process when he admittedly denied McAfee's request for C/O Hill to be called as a witness at the disciplinary hearing. It is undisputed that Hill lacked personal knowledge of what transpired during the riot in the dining hall. McAfee wanted to call Hill as a witness that he was in the kitchen and "was on crutches from knee surgery and could not walk without them. Defendant Rivero denied Plaintiff's witness as irrelevant." McAfee Decl. #2, ¶ 8. Defendant Rivero indisputably was correct: the proposed witness had no relevant information. Rivero did not question


that McAfee was on crutches, but being on crutches did not negate the possibility of participation in a riot. Likewise, because one of the riots occurred in the dining hall, testimony from Hill that McAfee was in the dining hall that day would not have made any difference. Hill simply did not see the attack on McAfee or McAfee's reaction to it. The requirement that the inmate be allowed to call witnesses does not include a right to call witnesses who do not have relevant information. *See Wolff*, 418 U.S. at 566. No reasonable jury could find a due process violation based on the failure to call a witness who had no relevant information.

Viewing the evidence and reasonable inferences therefrom in the light most favorable to McAfee, no reasonable jury could find in his favor on his due process claim against defendant Rivero. Assuming for present purposes that McAfee was deprived of a protected liberty interest, he received all the procedural protections due him before that deprivation occurred.

Rivero also is entitled to qualified immunity against the due process claim. Rivero prevails on the first prong of the test from *Saucier*, 533 U.S. at 201, because the evidence shows no constitutional violation.

### VI. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**. (Docket # 39.) Judgment will be entered (a) in favor of Defendants Hill and Rivero and (a) dismissing all other Defendants.

This order disposes of Docket No. 39. The Clerk shall close the file.

IT IS SO ORDERED.

Dated: July 20, 2011

_____
EDWARD M. CHEN
United States District Judge